**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LINDA MORRIS, KEVIN MORRIS, and MARSHA DONALDSON on behalf of themselves and all others similarly situated, | Civil Action No.:_____ |
| **Plaintiffs,** | |
| **v.** | **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| **METROPOLITAN LIFE INSURANCE COMPANY,** | |
| **Defendant.** | |

Plaintiffs Linda Morris, Kevin Morris, and Marsha Donaldson (collectively "Plaintiffs"), by and through their counsel, individually and on behalf of all others similarly situated, bring this class action on behalf of the Class and Subclasses defined below against Defendant Metropolitan Life Insurance Company ("Defendant" or "MetLife") and allege upon information and belief and based upon the investigation of their counsel, as follows:

## INTRODUCTION

1.      This is a class action for damages, restitution, and injunctive relief brought by Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of members of the Class and Subclasses as defined herein against MetLife.

2.      MetLife is an insurance provider that markets and sells long-term care insurance policies.

3.      Plaintiffs and members of Class are elderly individuals who purchased long-term care insurance policies from MetLife and selected MetLife's non-standard payment structure, the "Reduced Pay at 65" rider or option (referred to as the "Reduced Pay at 65" payment structure).[1]

---

[1] When Plaintiffs Linda and Kevin Morris purchased their long term care policies from MetLife in 2005, MetLife offered the "Reduced Pay at 65" payment structure as an "option." When Plaintiff Marsha Donaldson purchased her

4.      The "Reduced Pay at 65" rider states that "[t]his Rider provides that You pay an increased premium prior to age 65 for your coverage.  Then, on the Policy Anniversary on or after Your 65th birthday, the premium for your coverage will be reduced to 50% of the premium that You paid prior to age 65." Exhibit 1.

5.      Plaintiffs and members of the Class relied upon the statements and representations made by MetLife, which promised that in return for paying increased premiums prior to reaching their policy anniversary on or after their 65th birthday, they would thereafter enjoy fixed premiums set at 50% of the premium they paid prior to turning 65.

6.      Plaintiffs and members of the Class reasonably relied on MetLife's representations and reasonably believed that the "Reduced Pay at 65" payment structure would safeguard against increases in premium payments after the policyholders reached the age of 65 and were likely living on fixed incomes.

7.      Therefore, by selecting the "Reduced Pay at 65" payment structure, policyholders agreed to pay higher premiums before the policy anniversary on or following their 65th birthday in exchange for paying a lower, fixed premium thereafter, equal to 50% of the premium they paid prior to age 65.

8.      Yet, contrary to its uniform representations and contractual obligations, MetLife has imposed steep premium increases upon policyholders like Plaintiff Linda Morris and Marsha Donaldson after the policy anniversary following their 65th birthday, violating the express language of the "Reduced Pay at 65" payment structure.

---

long term care policy from MetLife in 2008, MetLife offered the "Reduced Pay at 65" payment structure as a "rider."  As demonstrated by the relevant policy and marketing language quoted throughout this Complaint and MetLife's actions described herein, whether titled as an "option" or a "rider," the "Reduced Pay at 65" payment structure at issue is substantively identical.

9.        In short, Plaintiffs allege that MetLife lured them into a policy by promising a trade of higher short-term premium expense in exchange long-term premium stability after age 65.  But, MetLife but did not deliver.

## PARTIES

10.        Plaintiff Linda Morris purchased a long-term care insurance policy from MetLife in 2005 when she was 53 years old, and selected the "Reduced Pay at 65" payment structure. Her policy (Policy No. 06587-1033) became effective on September 12, 2005.  A copy of the policy is attached hereto as Exhibit 2.  Ms. Morris resides in and is a citizen of Arizona.

11.        Plaintiff Kevin Morris purchased a long-term care insurance policy from MetLife in 2005 when he was 48 years old, and selected the "Reduced Pay at 65" payment structure.  His policy (Policy No. 06587-1032) became effective on September 12, 2005. A copy of the policy is attached hereto as Exhibit 3.  Mr. Morris resides in and is a citizen of Arizona.

12.        Plaintiff Marsha Donaldson, while living in Alabama, purchased a long-term care insurance policy from MetLife in 2008 when she was 58 years old, and selected the "Reduced Pay at 65" payment structure.  Her policy (Policy No. 14363-54476) became effective on April 1, 2008.  A copy of the policy is attached hereto as Exhibit 4.  Ms. Donaldson currently resides in and is a citizen of Mississippi.

13.        At all times mentioned herein, Defendant MetLife was a corporation organized under the laws of the State of New York, with its principal place of business in New York, New York.

## JURISDICTION & VENUE

14.        This Court has original diversity jurisdiction of this matter pursuant to 28 U.S.C. § 1332(d)(2), as this is a class action in which members of the putative Class are citizens of a

State different from Defendant, and the amount in controversy exceeds $5,000,000 exclusive of interests and costs.

15.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events, circumstances, and omissions giving rise to these claims occurred in this district.

## FACTUAL BACKGROUND

**The Policy and Premium Payment Plan**

16.     MetLife markets and sells long-term care insurance policies. In doing so, MetLife offers multiple "premium payment options" designed to attract prospective purchasers.

17.     One such "premium payment option" is the "Reduced Pay at 65" payment structure, which is designed to alleviate applicants' and policyholders' concerns about future premium increases after the age of 65 when they are living on a fixed income.

18.     The brochure ("Brochure") MetLife uses to market its long-term care insurance to prospective purchasers describes the "Reduced Pay at 65" option as follows:

> **Reduced Pay at 65 Option**:
> By paying more than the regular premium amount you would pay each year up to the policy anniversary on or after your 65th birthday, you pay half the amount of your pre-age 65 premiums thereafter.

Exhibit 5, p. 9.

19.     The "Reduced Pay at 65" option is described similarly in a "Long Term Care Insurance Proposal" ("Proposal") MetLife provided to Plaintiffs Linda and Kevin Morris when they were shopping for long term care insurance.   The 14-page document described the benefits of long-term care insurance, the terms of coverage (including premium amounts), and premium payment options available.

20.     Under "Premium Payment Riders/Options," the Proposal describes the "Reduced

Pay at 65" option as follows:

> Reduced Pay at 65 Option
> You pay an increased premium amount until the Policy Anniversary on or
> after your 65th birthday, after which, the premium is reduced to 50% of the
> original amount paid.  This option is not available for any coverage
> increases.

Exhibit 6, p. 10.

21.     MetLife intended that Plaintiffs and the Class members would rely on these

descriptions of the "Reduced Pay at 65" payment structure in deciding to purchase their policies,

and Plaintiffs and the Class members did rely on these descriptions of the "Reduced Pay at 65"

structure in deciding to purchase their policies from MetLife.

22.     Based on these descriptions and the express language of the "Reduced Pay at 65"

payment structure, Plaintiffs and the Class members purchased long-term care insurance policies

from MetLife and selected the "Reduced-Pay at 65" payment structure with the understanding

that their premiums would not increase after they turned 65 years of age.

23.     Thereafter, MetLife issued policies to Plaintiffs and the Class members containing

descriptions of the "Reduced Pay at 65" payment structure that were fully consistent with

MetLife's pre-purchase representations.

24.     For instance, Linda Morris' policy provides the following under the heading

"PREMIUM SCHEDULE" on the Schedule of Benefits issued in 2005:

> **In addition, you have selected the following flexible premium payment**
> **option: Reduced Pay at 65**
> Annual Premium Amount*:
>       Before Policy Anniversary at age 65     $1961.55
>       On and after Policy Anniversary at age 65   $980.78

*If you pay premiums more frequently than annually, an additional cost has been included.

Exhibit 7.

    25.    The Schedule of Benefits issued in 2005 in Kevin Morris' policy similarly

provides:

**In addition, you have selected the following flexible premium payment option: Reduced Pay at 65**
Annual Premium Amount*:
        Before Policy Anniversary at age 65      $1553.91
        On and after Policy Anniversary at age 65    $776.95

*If you pay premiums more frequently than annually, an additional cost has been included.

Exhibit 8.

    26.    Marsha Donaldson's Schedule of Benefits issued in 2008 contains the following

substantially similar language:

**In addition, you have selected the Reduced Pay at 65 Rider**
Monthly Premium Amount*:
        Before Policy Anniversary at age 65      $223.46
        On and after Policy Anniversary at age 65    $111.73

*If you pay premiums more frequently than annually, an additional cost has been included. Please refer to Your application, "How You Want to Pay Premiums", to explain the basis for any additional charge.

Exhibit 9.

    27.    The "Reduced Pay at 65" rider contained in Ms. Donaldson's policy also defines

the "Reduced Pay at 65" payment structure consistently with MetLife's pre-purchase

representations:

**This Rider provides that You pay an increased premium prior to age 65 for your coverage.  Then, on the Policy Anniversary on or after your 65th Birthday, the premium for Your coverage will be reduced to 50% of the premium that You paid prior to age 65.**
\*\*\*

| | |
|---|---|
| **Premiums Prior to Age 65** | There will be an increased premium rate for the coverage that is in effect for You prior to the **Policy Anniversary** on or next following you 65th birthday. |
| **Premiums After Age 65** | If this Rider remains in effect, then on the **Policy Anniversary** on or next following your 65th birthday, the premium for the coverage that was in effect for You on the Original Coverage Effective Date of Your policy will be reduced to 50% of the premium that You paid prior to age 65. |
| *** | *** |
| **Premium for this Rider** | **The premium for this rider is shown in the Premium Schedule on page 3 of the policy….** |

Exhibit 1.

28.    Thus, all of MetLife's marketing materials and policy documents describe the "Reduced Pay at 65" payment structure consistently:  In exchange for paying increased premiums prior to their policy anniversary on or after their 65th birthday, policyholders thereafter enjoy a fixed premium equal to one-half (50%) of the premium paid prior to their 65th birthday.

**Plaintiffs Linda and Kevin Morris**

29.    Plaintiffs Linda and Kevin Morris considered purchasing long-term care insurance policies in 2005 when Linda was 53 and Kevin was 48.

30.    MetLife provided Linda and Kevin the Brochure (discussed above) that MetLife uses to market its long-term care insurance to prospective purchasers.  It described the "Reduced Pay at 65" option as follows:

> Reduced Pay at 65 Option:
> By paying more than the regular premium amount you would pay each year up to the policy anniversary on or after your 65th birthday, you pay half the amount of your pre-age 65 premiums thereafter.

Exhibit 5, p. 9.

31.    Plaintiffs Linda and Kevin Morris reasonably understood that pursuant to the "Reduced Pay at 65" payment structure, they would pay increased premiums until their policy anniversary following their 65th birthdays, after which they would pay fixed premiums equal to one-half (50%) of their pre-age 65 premiums.

32.    Thereafter, MetLife provided Linda and Kevin the personalized Proposal (discussed above) which set forth several premium payment options.  According to the Proposal, if Linda and Kevin selected the standard premium option, Linda would be responsible for paying premiums equal to $1,852.70 per year and Kevin would be responsible for paying premiums equal to $1,571.58 per year. Exhibit 6, p. 5.  Alternatively, if Linda and Kevin selected the "Reduced Pay at 65" option, Linda would be responsible for paying premiums equal to $2,241.77 per year prior to turning 65 years old, and $1,120.88 per year thereafter, while Kevin would be responsible for paying premiums equal to $1,775.89 per year prior to turning 65 years old, and $887.94 per year thereafter. Exhibit 6, p. 5.

33.    Based on their review of the Proposal and Brochure which were consistent with the representations made by the long term care insurance sales representative, Linda and Kevin Morris agreed to purchase policies with MetLife and selected the "Reduced Pay at 65" payment structure.

34.    When Linda and Kevin Morris subsequently received their policy documents from MetLife, the policy documents described the premium payment schedule consistently with the Brochure and Proposal, with Linda and Kevin paying higher premiums until their policy anniversary following their 65th birthdays, after which time their premiums would be fixed at 50% of the premiums paid prior to their 65th birthdays.  More specifically, Linda Morris'

"PREMIUM SCHEDULE" provided that her annual premium amount "Before Policy Anniversary at age 65" was $1961.55 and then "On and after Policy Anniversary at age 65" it would be $980.78, or 50% of the pre-age 65 premium.  Exhibit 7.  Kevin Morris' "PREMIUM SCHEDULE" provides that his annual premium amount "Before Policy Anniversary at age 65" was $1553.91 and then "On and after Policy Anniversary at age 65" it would be $776.95, or 50% of the pre-age 65 premium. Exhibit 8.

35.    Linda and Kevin Morris reasonably understood the Brochure, Proposal, the representations made by the long term care insurance sales representative, and the policies to be consistent, and that under the "Reduced Pay at 65" payment structure, they would pay increased premiums prior to their policy anniversaries after their 65th birthdays in exchange for permanent, fixed premiums equal to 50% of their pre-age 65 premiums thereafter.

36.    Effective September 12, 2010, MetLife instituted a nearly 20% premium increase on the policies purchased by Linda and Kevin Morris. Exhibits 7 and 8.  Because of these premium increases, MetLife increased Linda's annual premium from $1,961.55 to $2,314.68 and increased Kevin's annual premium from $1,553.91 to $1,833.60.  Exhibits 10 and 11.

37.    When Linda turned 65 years old in 2017, her MetLife annual premium was $2,314.68.  So, following the policy anniversary following her 65th birthday (September 12, 2017 was the policy anniversary following Linda's 65th birthday), Linda's premium should have been locked at 50% of $2,314.68 ($1,157.34).

38.    On July 26, 2017, MetLife sent letters to Linda and Kevin announcing a future 32% increase in their premiums.  According to the letter, the increase would be implemented in two phases.  Under the first phase, which would become effective on September 12, 2018, Linda's annual premium would increase 16.19% from $1,157.34 to $1,344.75 and Kevin's

9

annual premium would increase 16.19% from $1,833.60 to $2,130.47. The letters stated that the second phase would involve an increase of "approximately 16.19%" and would occur "no sooner" than September 12, 2019. And, MetLife made it quite clear in this same letter that it will request additional premium increases in the future. Exhibits 12 and 13.

39.     Because Linda turned 65 prior to the September 12, 2018 premium increase effective date and because the policy anniversary following her 65th birthday occurred prior to September 12, 2018 (occurring on September 12, 2017), Linda was entitled to a fixed, reduced premium equal to 50% of her premium prior to turning 65 ($1,157.34 annually).

40.     Under the heading "Options to consider," the letters informed Linda and Kevin that they could reduce or cancel their coverage to avoid the substantial premium increase.

41.     To avoid paying the exorbitant premium increases which they could not afford, Linda and Kevin Morris were forced to reduce their coverages. MetLife sent letters to Linda and Kevin on August 22, 2017 confirming the coverage reduction, which reduced Linda's premium to $1,152.61 and reduced Kevin's premium to $1,826.11 "before Policy Anniversary at age 65" and $913.06 "On and after Policy Anniversary at age 65." Exhibits 14 and 15. In exchange for the premium reductions, MetLife reduced Linda's and Kevin's Daily Benefit Amount from $239.45 to $226.28.

42.     MetLife's actions, including the July 26, 2017 letter alerting her to the future premium increases, forced Linda Morris to reduce her Daily Benefit Amount in order to avoid the first of several promised and substantial premium increases. Linda and Kevin will be forced to make similar benefit reductions when the future premium increases are implemented.

43.     MetLife's actions described above are illegal and violate the express terms of the "Reduced Pay at 65" payment structure because, as of July 26, 2017, Linda Morris was entitled

to her full policy benefits as long as she continued to pay her fixed, reduced annual premium of $1,157.34 (equal to 50% of her premium prior to turning 65).

**Marsha Donaldson**

44.    Plaintiff Marsha Donaldson purchased a long-term care insurance policy from MetLife in 2008 when she was 58 years old.

45.    Based on descriptions and materials provided by MetLife which were consistent with the representations made by the long term care insurance sales representative, Marsha selected the "Reduced Pay at 65" payment structure.

46.    In accordance with MetLife's descriptions of the "Reduced Pay at 65" payment structure as well as the representations made by the long term care insurance sales representative, Ms. Donaldson reasonably understood that she would pay increased premiums until the policy anniversary on or after her 65th birthday, after which time she would pay fixed premiums equal to one-half, or 50%, of the premium she paid prior to her 65th birthday.

47.    Consistent with her understanding, Ms. Donaldson's policy describes the premium payment schedule as requiring payments after the policy anniversary following her 65th birthday at 50% of what she had been prior to turning 65.  More specifically, the PREMIUM SCHEDULE in Ms. Donaldson's policy states that her monthly premium was $223.46 (i.e., $2,681.52 annually) "Before Policy Anniversary at age 65" and $111.73 (i.e., $1,340.76 annually) "On and after Policy Anniversary at age 65."  Exhibit 9.

48.    Also consistent with her understanding is the express language MetLife included in the "Reduced Pay at 65" rider:  "This Rider provides that You pay an increased premium prior to age 65 for your coverage.  Then, on the Policy Anniversary on or after Your 65th birthday, the

11

premium for Your coverage will be reduced to 50% of the premium that You paid prior to age 65" Exhibit 1.

49.     Ms. Donaldson reasonably understood that after the Policy Anniversary following her 65th birthday, the permanent or fixed premium would be set at the rate of 50% of the premium she had paid prior to turning 65.

50.     This is consistent with the representations made by MetLife's long term care insurance representatives who told Ms. Donaldson that her premiums would be "fixed" and would not increase following her policy anniversary once she turned 65.

51.     On July 10, 2013, before Ms. Donaldson turned 65, MetLife sent her a letter announcing that it was implementing a 58% premium increase on her policy in three phases. The initial increase would be equal to 20% and would raise her monthly premium from $223.46 to $268.15 (i.e., $3,217.80 annually) beginning October 1, 2013.   According to the letter, the second phase of the premium increase would be "approximately 20%" and would occur "no sooner" than October 1, 2014, and the final phase would be equal to "approximately 9.7%" and would occur "no sooner" than October 1, 2015.  Exhibit 16.  Because she was still working in July 2013 and was not living on a fixed income, Ms. Donaldson agreed to pay the initial increased premium to keep her long term care benefits intact.

52.     In or about August 2014, MetLife changed its billing system from monthly to quarterly premium payments.

53.     When Ms. Donaldson turned 65 years old in 2014, her MetLife annual premium was $3,217.80.  So, after the policy anniversary following her 65th birthday (April 1, 2015 was the policy anniversary following Ms. Donaldson's 65th birthday), Ms. Donaldson's premium should have been locked at 50% of $3,217.80 ($1,608.90 annually or $402.23 quarterly).

54.      On October 10, 2014, *after Ms. Donaldson turned 65* and after she had retired, MetLife sent her a letter announcing that the second phase of the increase would raise her quarterly premium from $789.56 to $947.47 (i.e., from $3,217.80 annually to $3,789.88 annually) beginning January 1, 2015.  In this letter, MetLife stressed that **"[it] has the right to increase rates in the future**." (emphasis in original).  MetLife's declaration to Ms. Donaldson that "it has the right to increase rates in the future" is contrary to the terms of the "Reduced Pay at 65" rider as Ms. Donaldson was quickly approaching her April 1, 2015 policy anniversary following her 65th birthday at which point her premium should have been fixed at 50% of her pre-age 65 premium (50% of $3,217.80 or $1,608.90 annually or $402.23 quarterly). Exhibit 17.

55.      Under the heading "Options to consider," the letter informed Ms. Donaldson that she could reduce or cancel her coverage to avoid the substantial premium increase.

56.      Instead of paying the increased premiums, Ms. Donaldson agreed to reduce her coverage from a $182 Daily Benefit Amount to a $156 Daily Benefit Amount because she was recently retired and living on a fixed income.  This reduction in coverage lowered Ms. Donaldson's Total Lifetime Benefit by nearly $50,000 (from $332,150 to $284,700).   MetLife sent a letter on December 9, 2014 confirming that under her newly reduced coverage, Ms. Donaldson's quarterly premium would be $812.12 (i.e., $3,248.48 annually) effective January 1, 2015. As of Ms. Donaldson's April 1, 2015 Policy Anniversary date following her 65th birthday, her quarterly premium would be $406.06.  Exhibit 18.

57.     Effective April 1, 2016, *after Ms. Donaldson turned 65 and after the Policy Anniversary following her 65th birthday,* MetLife again increased Ms. Donaldson's quarterly premium to $445.45 (i.e., $1,781.80 annually).[2]  Exhibit 19.

58.     Prior to this increase (since April 20, 2015), Ms. Donaldson had been paying $406.06 per quarter (i.e., $1,624.24 annually).

59.     On October 1, 2017, MetLife again increased Ms. Donaldson's quarterly premium to $507.82 (i.e., $2,031.28 annually), which is equivalent to 50% of a pre-age 65 annual premium of $4,062.56. Exhibit 20.  This $507.82 quarterly premium is $105.59 more than the $402.23 quarterly premium she should be paying according to the express terms of the "Reduced Pay at 65" rider.

60.     MetLife's increases of Ms. Donaldson's premium after the Policy Anniversary following her 65th birthday were illegal and in direct contravention of the terms contained in the "Reduced Pay at 65" payment structure.

## CLASS ACTION ALLEGATIONS

61.     Plaintiffs bring this action on behalf of the following Class and Subclasses:

**Nationwide Class –** All individuals who purchased long-term care insurance policies from MetLife that include the "Reduced Pay at 65" payment structure.

**Damages Subclass –** All individuals in the Nationwide Class who received one or more notices from Defendant of a premium increase to be effective after the policy anniversary date on or after their 65th birthday.

**Arizona Subclass -** All individuals in the Nationwide Class or the Damages Subclass who reside in the State of Arizona.

---

[2] $1,781.80 is equivalent to 50% of a pre-age 65 annual premium of $3,563.60.  However, because Ms. Donaldson was now past the Policy Anniversary following her 65th birthday, she should have been paying only $402.23 per quarter (the quarterly amount she paid prior to her 65th birthday).

62.     Excluded from the Nationwide Class and Subclass definitions  are:  (1) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns, and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel.

63.     Upon information and belief, many thousands of Defendant's long term care policyholders selected the "Reduced Pay at 65" payment structure substantially similar to the "Reduced Pay at 65" payment structure selected by Plaintiffs.

64.     Upon information and belief, many thousands of these policies remain in force.

65.     Upon information and belief, MetLife continues to raise the premiums charged to members of the Class, even after they reach the policy anniversary date on or after their 65th birthday.

66.     The Nationwide Class and Subclass members are so numerous that joinder of all members is impracticable as there are believed to be many thousands of Nationwide Class members and thousands of Subclass members.

67.     There are numerous questions of law and fact common to the Nationwide Class and Subclasses as a whole including, but not limited to, the following:

a.     Whether the relevant policy terms of the Class members' "Reduced Pay at 65" payment structure selections are substantially similar;

b.     Whether MetLife uniformly advertised the "Reduced Pay at 65" payment structure;

c.     Whether MetLife instituted one or more premium increase to policyholders after those policyholders reached the policy anniversary date on or after their 65th birthday;

    d.    Whether MetLife breached the terms of the Reduced Pay at 65 payment
structure;

    e.    Whether MetLife breached the terms of the Reduced Pay at 65 payment
structure in bad faith or in a manner that was wanton or reckless; and

    f.    Whether MetLife violated the Arizona Consumer Fraud Act, A.R.S. § 44-
1522.

68.    Plaintiffs' claims are typical of the claims of the members of the Nationwide
Class and Subclasses.

69.    Plaintiffs will fairly and adequately protect the interests of the Nationwide Class
and Subclasses and have engaged Counsel experienced in litigating class actions and experienced
in litigating long term care coverage actions.

70.    The prosecution of separate actions by or against individual members of the
Nationwide Class and Subclasses will create a risk of inconsistent or varying adjudications with
respect to the individual members of the Nationwide Class and Subclasses, which could establish
incompatible standards of conduct for the Defendant.

71.    Defendant has acted and is refusing to act on grounds generally applicable to the
Nationwide Class and Subclasses as a whole, thereby making final injunctive and declaratory
relief with respect to the Nationwide Class and Subclasses as a whole appropriate.

72.    To that end, (1) upon information and belief, individual Nationwide Class and
Subclass members' interest in controlling and litigating separate actions would be low for a
number of reasons including the difficulty of retaining and paying counsel to litigate their claims;
(2) the extent and nature of any litigation previously commenced concerning this controversy has
been few and far between and is likely to only involve a few policy holders; (3) it is highly

desirable to concentrate this litigation in this particular forum so as to ensure that every member of this highly vulnerable, frail, ill, and aged population receives their full policy benefits at the appropriate premium described in the "Reduced Pay at 65" payment structure; and (4) there likely would be little, if any, difficulties encountered in the management of this case as a class action as the Defendant will have records identifying each member of the Nationwide Class and the Subclasses.

## COUNT I

**Declaratory Relief Under the Declaratory Judgment Act (28 U.S.C. §2201, _et seq._)**

**(Brought on Behalf of the Nationwide Class)**

73.     Plaintiffs incorporate all of the above paragraphs as if fully stated herein.

74.     Plaintiffs bring this count on behalf of the Nationwide Class.

75.     An actual controversy has arisen and now exists between Plaintiffs and members of the Nationwide Class on the one hand, and MetLife, on the other hand, concerning their respective rights and duties of the terms of the "Reduced Pay at 65" payment structure.

76.     More specifically, an actual controversy exists regarding MetLife's repeated, ongoing, and improper premium increases directed to policyholders who purchased the "Reduced Pay at 65" payment structure after those policyholders reach their policy anniversary date on after their 65th birthday.

77.     A judicial declaration is necessary and appropriate at this time, under the circumstances presented, in order that Plaintiffs, the members of the Nationwide Class and Defendant may ascertain their respective rights and duties with respect to the "Reduced Pay at 65" payment structure.

## COUNT II

### Breach of Contract

### (Brought on Behalf of the Damages Subclass)

78.    Plaintiffs Linda Morris and Marsha Donaldson ("Damages Plaintiffs") incorporate all of the above paragraphs as if fully stated herein.

79.    Damages Plaintiffs bring this count on behalf of the Damages Subclass.

80.    Damages Plaintiffs' policies, and the policies of the Damages Subclass members, contain the following general provisions regarding the potential for future rate increases:

> **RENEWABILITY: THIS POLICY IS GUARANTEED RENEWABLE FOR LIFE. PREMIUM RATES ARE SUBJECT TO CHANGE**. This means You have the right, subject to the terms of the policy, to continue this policy as long as You pay Your premiums on time. We cannot change any of the terms of this policy without Your consent, except that We may change the premium rates, subject to applicable state Insurance Department approval. Any such change in premium rates will apply to all policies in the same class as Yours in the state where the policy was issued.

Exhibit 4, p. 1.[3]

> We reserve the right to change premium rates on a class basis. The premium will not increase because You get older or Your health changes. Your premiums will change if We change Your benefit amounts as a result of Your request or as a result of an increase as provided under the terms of this policy.

Exhibit 4, p. 24.[4]

81.    However, Damages Plaintiffs' policies, and the policies of the Damages Subclass members, contain more specific language regarding the "Reduced Pay at 65" payment structure. For instance, Plaintiff Marsha Donaldson's policy contains the following language:

> **This Rider provides that you pay an increased premium prior to age 65 for Your coverage.  Then, on the Policy Anniversary on or after Your 65th birthday, the premium for Your coverage will be reduced to 50% of the premium that You paid prior to age 65.**

---

[3] Linda Morris' policy contains similar language.  Exhibit 2, p. 1.
[4] Linda Morris' policy contains this same language. Exhibit 2, p. 24.

Exhibit 1.

82.    Plaintiff Linda Morris' policy contains the following language:

**In addition, you have selected the following flexible premium payment option: Reduced Pay at 65**

Annual Premium Amount*:
    Before Policy Anniversary at age 65            $1961.65
    On and after Policy Anniversary at age 65    $ 980.78

*If you pay premiums more frequently than annually, an additional cost has been included.

Exhibit 7.

83.    By selecting the "Reduced-Pay at 65" payment structure, Damages Plaintiffs and members of the Damages Subclass modified the general provisions, terms and conditions of their policies and permanently fixed their premiums on or after their policy anniversary following their 65th birthday at 50% of their premium paid prior to their 65th birthday.

84.    In the alternative, the policies are ambiguous and subject to more than one reasonable interpretation because the policies fail to articulate the relationship between the general provisions purporting to allow future "class" or "class wide" rate increases and the "Reduced Pay at 65" payment structure specific provisions.

85.    Because the policies are ambiguous, they must be construed against MetLife and in favor of Damages Plaintiffs and the members of the Damages Subclass.

86.    Construing the policies in favor of Damages Plaintiffs and the Damages Subclass, by selecting the "Reduced Pay at 65" payment structure, policyholders agreed to pay more than the regular premium amount they would have otherwise paid each year up until the policy anniversary following their 65th birthday in exchange for paying thereafter 50% of the premium they paid prior to their 65th birthday.

87.     MetLife breached its contract with Damages Plaintiffs and members of the Damages Subclass by increasing their premiums above 50% of their pre-age 65 premiums.

88.     As a result of MetLife's breach, Damages Plaintiffs and the members of the Damages Subclass suffered damages including, but not limited to, increased premiums and/or decreased coverage.

## COUNT III

## Breach of Arizona Consumer Fraud Act, A.R.S. § 44-1522

### (Brought on Behalf of the Arizona Subclass)

89.     Plaintiff Linda Morris ("Arizona Plaintiff") incorporates all of the above paragraphs as if fully stated herein.

90.     Arizona Plaintiff brings this count on behalf of members of the Arizona subclass.

91.     The Arizona Consumer Fraud Act prohibits "unlawful practices" in consumer transactions.  The Act defines an "unlawful practice" as:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby...

A.R.S. § 44-1522(A).

92.     When marketing the "Reduced Pay at 65" payment structure, MetLife represented to Arizona Plaintiff and the Arizona Subclass that if they paid more than the regular premium amount up until reaching the policy anniversary following their 65th birthday, they would "pay half the amount of [their] pre-age 65 premiums thereafter."

93.     That representation was deceptive and constitutes an unlawful practice because MetLife has, and continues, to impose premium increases upon the Arizona Plaintiff and the

Arizona Subclass after the policy anniversary following their 65th birthdays in a manner that is wanton and reckless.

94.    Further that representation was deceptive and constitutes and unlawful practice because MetLife intended to increase the premiums of Arizona Plaintiff and members of the Arizona Subclass after the policy anniversary following their 65th birthdays using the general and ambiguous "class" and "class-wide" future increase language of the policies discussed above. Notably, MetLife did not define the "class" for purposes of the policies.

95.    At the very least, Defendant's representations regarding the "Reduced Pay at 65" payment structure created a likelihood of confusion or misunderstanding regarding MetLife's ability to increase the premiums of Arizona Plaintiff and members of the Arizona Subclass.

96.    MetLife intended that Arizona Plaintiff and members of the Arizona Subclass would rely on Defendant's deceptive statements regarding the "Reduced Pay at 65" payment structure when deciding to purchase individual long-term care insurance policies from Defendant.

97.    Arizona Plaintiff and members of the Arizona Subclass relied on the foregoing deceptive statements when deciding to purchase the policies and selecting the "Reduced Pay at 65" payment structure.

98.    Arizona Plaintiff and the members of the Arizona Subclass have been damaged as a direct and proximate result of Defendant's deceptive and illegal conduct because they are now paying higher premiums than they are obligated to and/or they reduced their policy benefits in order to alleviate the financial burden imposed by the illegal premium increases.

99.     Further, because Defendant's conduct was and continues to be wanton and reckless, Arizona Plaintiff and the Arizona Subclass are entitled to punitive damages, attorneys' fees, and all other appropriate fees, costs, and damages.

## COUNT IV

### Fraud

**(Brought on Behalf of the Damages Subclass)**

100.     Damages Plaintiffs incorporate all of the above paragraphs as if fully stated herein.

101.     Damages Plaintiffs bring this Count on behalf of the Damages Subclass.

102.     Damages Plaintiffs and Damages Subclass members applied for and purchased their policies before ever receiving copies of the policies themselves.

103.     In marketing the policies, MetLife knowingly and intentionally represented to Damages Plaintiffs and Damages Subclass members that by selecting the "Reduced Pay at 65" payment structure, policyholders would "pay[] more than the regular premium amount ... each year up to the policy anniversary on or after [their] 65th birthday,"  in exchange for "pay[ing] half the amount of [their] pre-age 65 premiums thereafter."

104.     The language Defendant used to market the "Reduced Pay at 65" payment structure promised that in return for higher premiums prior to the policy anniversary following their 65th birthday, purchasers would subsequently have permanent premiums fixed at 50% the amount of their pre-65 premiums.

105.     When MetLife made these representations, it knew or should have known that the statements were false, and that MetLife would take the position that it had an unfettered right to

increase premiums even after Damages Plaintiffs and members of the Damages Subclass reached their policy anniversary following their 65th birthday.

106.     MetLife made the foregoing representations to induce Damages Plaintiffs and the Damages Subclass members to purchase the policies and select the "Reduced Pay at 65" payment structure, thereby allowing MetLife to collect increased premiums.

107.     Damages Plaintiffs and members of the Damages Subclass purchased their respective policies and selected the "Reduced Pay at 65" payment structure in justifiable reliance upon Defendant's representations regarding the "Reduced Pay at 65" payment structure.

108.     Had Damages Plaintiffs and the Damages Class members known that the "Reduced Pay at 65" payment structure did not guarantee fixed premiums at 50% the amount of their pre-65 premiums, they would not have purchased the option and would not have paid increased premiums prior to their policy anniversary following their 65th birthday.

109.     As a direct result of the foregoing misrepresentations, Damages Plaintiffs and the Damages Subclass members suffered damages, including but not limited to, increased premiums and reduced coverages.

**COUNT V**

**Fraudulent Concealment**

**(Brought on Behalf of Damages Subclass)**

110.     Damages Plaintiffs incorporate all of the above paragraphs as if fully stated herein.

111.     Damage Plaintiffs bring this Count on behalf of the members of the Damages Subclass.

112.    MetLife affirmatively represented to Damages Plaintiffs and members of the Damages Subclass that their premiums after their policy anniversary following their 65th birthday would be fixed at 50% of their pre-age 65 premiums.

113.    At the time it offered the "Reduced Pay at 65" payment structure, MetLife knew that it would impose premium increases on Damages Plaintiffs and the Damages Subclass members after their policy anniversaries following their 65th birthday.

114.    Damages Plaintiffs and members of the Damages Subclass could not have discovered that they were potentially subject to premium increases following their policy anniversary after their 65th birthday through reasonable inquiry, attention, observation or judgment.

115.    By omitting the above aforementioned facts, MetLife intended to induce Damages Plaintiffs and members of the Damages Subclass to believe that under the "Reduced Pay at 65" payment structure, their premiums following their policy anniversary after their 65th birthday would be fixed at 50% of the premiums paid prior to the time they turned 65.

116.    Damages Plaintiffs and members of the Damages Subclass reasonably relied upon the representations made by MetLife in purchasing the policies and selecting the "Reduced Pay at 65" payment structure.

117.    As a direct result of the foregoing misrepresentations and omissions, Damages Plaintiffs and Damages Subclass members suffered damages, including but not limited to, increased premiums and reduced coverages.

# COUNT VI

## Unjust Enrichment

### (Brought on Behalf of Damages Subclass)

118.    Damages Plaintiffs incorporate all of the above paragraphs as if fully stated herein.

119.    Damages Plaintiffs bring this Count on behalf of the members of the Damages Subclass.

120.    Under the "Reduced Pay at 65" payment structure, Damages Plaintiffs and members of the Damages Subclass agreed to pay increased premiums prior to the policy anniversary following their 65th birthday in consideration for premium payments thereafter fixed at 50% of the amount they paid prior to turning 65.

121.    Damages Plaintiffs and Members of the Damages Subclass upheld their end of the bargain, and have paid increased premiums prior to their policy anniversary following their 65th birthday.

122.    Defendant, however, has instituted premium increases upon Damages Plaintiffs and the Damages Subclass after the policy anniversary following their 65th birthday.

123.    MetLife has raised premiums for Damages Plaintiffs and members of the Damages Subclass to rates greater than 50% of the amount they paid prior to turning 65.

124.    These premium increases caused Damages Plaintiffs and members of the Damages Subclass to pay premiums at rates higher than they had agreed to after their policy anniversary following their 65th birthday, or to reduce their agreed upon coverage in order to continue to afford payments. As a result, Damages Plaintiffs and members of the Damages

Subclass have conferred a benefit (excessive premiums) upon MetLife to which MetLife is not entitled.

125.    As a result, MetLife has been unjustly enriched by the increased premiums paid by Damages Plaintiffs and members of the Damages Subclass after their policy anniversary following their 65th birthday, and is liable to Damages Plaintiffs and members of the Damages Subclass for restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand the following relief on behalf of themselves and all others similarly situated:

A.    That an Order be entered certifying this action as a Class action under Federal Rule of Civil Procedure 23;

B.  Compensatory damages in such amount as demonstrated by the proofs at trial and that the Court deems just and proper;

C.  Punitive damages as to Counts for which such damages are available under applicable law and in an amount that the Court deems just and proper;

D.  Imposition of a constructive trust, an order granting recessionary and injunctive relief and other such equitable relief that the Court deems just and proper to prevent Defendant's ongoing wrongful conduct from continuing or to require Defendant to recalculate all premium payments as necessary so as to comply with the agreed-upon contractual terms;

E.  An appropriate claims resolution facility, funded by Defendant, to administer relief to the Class in this case;

F.  All statutory damages including all exemplary damages available under any applicable statutory provision;

G. Costs of litigation and attorneys' fees; and

H. All other appropriate relief.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all issues so triable.

Dated: May 3, 2018

Respectfully Submitted,

Todd S. Garber
Andrew White
**FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP**
445 Hamilton Avenue, Suite 605
White Plains, New York 10601
Tel: 914-298-3283
Fax: 914-824-1561
tgarber@fbfglaw.com
awhite@fbfglaw.com

Jeffrey S. Goldenberg (*Pro Hac Vice* application forthcoming)
**GOLDENBERG SCHNEIDER, LPA**
One West Fourth Street, 18th Floor
Cincinnati, OH 45202
Tel: 513-345-8297
Fax: 513-345-8294
jgoldenberg@gs-legal.com

Gary Mason (*Pro Hac Vice* application forthcoming)
**Whitfield Bryson & Mason LLP**
5101 Wisconsin Avenue NW | Ste 305
Washington, DC 20016
Tel: 202-640-1168
Fax: 202-429-2294
Gmason@wbmllp.com

Charles Schaffer (*Pro Hac Vice* application forthcoming)
**Levin Sedran & Berman LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: 215-592-1500

Fax: 215- 592-4663
CSchaffer@lfsblaw.com

*Attorneys for Plaintiffs*
*and the Putative Class and Subclasses*